IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LEANDER J. GREGG,

Plaintiff,

v.

OPINION and ORDER

24-cv-430-wmc

SHERIFF SCOTT KNUDSON, SERGEANT RICHARD WESTPHAL, SERGEANT NAOMI SIEBEN AND CORRECTIONAL OFFICER DALTON DODGE,

Defendants.

---

Plaintiff LeAnder Gregg, who is representing himself, claims that correctional staff at the St. Croix County Jail violated his rights under the First and Fourteenth Amendments by denying his requests to attend religious services while he was incarcerated at the jail. The parties have filed cross-motions for summary judgment. (Dkt. #23 & Dkt. #30.) However, as set forth in more detail below, neither party provided sufficient evidence from which the court can determine whether defendants' restrictions on plaintiff's religious exercise were reasonable or violated the First Amendment. Reluctantly, therefore, the remainder of the case schedule will be struck to provide the parties an opportunity to produce additional evidence and legal argument, after which the court will hold oral argument on the pending motions, if necessary.

## UNDISPUTED FACTS[1]

Leander Gregg is a practicing Christian who believes that regular participation in worship services and scripture study is essential to his religious practice. Between July 28 and September 18, 2023, Gregg was incarcerated at the St. Croix County Jail with work release privileges. During this time, he was also housed in a "Huber dorm," along with other inmates who also had work release privileges.

On August 13, 2023, Gregg filed the first of a number of grievances asking why Huber inmates were not provided church services. (Dkt. #23-1, at 1.) Jail staff responded that same day, advising that: "We are unable to put you in a room with medium/minimum inmates." (*Id.*) Gregg then filed another grievance stating, "I understand the minimum/medium inmates not being able to interact with Huber inmates, but then why is it that there isn't a church service provided for Huber inmates only?" (*Id.*) Sergeant Westphal responded on August 13 at 4:30 p.m., advising that "the St. Croix County Jails Policy" states:

> 'There should be no contact between the inmates in general population and those being authorized for education, work or other release. This is to minimize the risk of introducing contraband into the jail and to maintain facility security.'

(*Id.,* at 2.) Even so, Sergeant Westphal offered to "forward your concerns to Administration as maybe there is an alternative solution to allow Huber inmates to attend church." *Id.*

[1] Unless otherwise indicated, the following facts are drawn from the parties' proposed findings of fact and responses, as well as the record where appropriate. The court notes that defendants submitted no declarations or affidavits describing their own version of events, relying entirely on the grievances plaintiff submitted, statements from the St. Croix County Jail's Inmate Handbook, a packet for Huber inmates, and a policy on religious programs. (Dkt. #32.) Thus, where plaintiff has provided his sworn version of events and defendants provided no evidentiary alternative, the court has accepted plaintiff's version.

Just one hour later, at 5:32 p.m., Gregg filed a grievance with a subject line of "re: sunday church," stating:

> attn: Sgt. Wesphal 8915 the grievance I sent earlier was in no way meant to aggravate any staff members or to disregard or criticize any jail rules or policies regarding huber/medium inmates going to class. but I would like to ask someone in administration about getting religious programming for uber inmates as I like to have at least one day out of the week to study and exercise my religion so if you could point me in the correct direction administratively id appreciate it. thank you kindly-Gregg.

(*Id.,* at 3.) The next day, August 14, Sergeant Westphal again responded that he: "did not take [the] grievance in an aggravating or disrespectful way"; felt it was "a reasonable request"; and would "bring the issue forward today when I have a chance to talk to [the administration]." (*Id.*) This response prompted Gregg to file yet another grievance, asking that his request be forwarded "to the next in command" after Sergeant Westphal, to which Westphal responded that Gregg's "previous requests went directly to the Lieutenant and Captain which are next in command above me." (*Id.* at 4.)

Gregg heard back from the jail administration about his request to attend church services on August 21, when unspecified "jail staff" wrote to him that: he could "attend Overcomers in Christ group every other Saturday from 9:30 to 11:00 A.M. To do so, you need to make a formal request to programs." (*Id.,* at 1.) On August 22, Gregg filed a routine request with a subject line of "program request," the body of which asked: "[C]an I be signed up for Saturday church. Overcomers in Christ." (*Id.*, at 5). That same day, jail staff responded, "Group is full. I added you to the waiting list." (*Id.*)

On September 14, 2023, at approximately 11:00 P.M., when he was returning from work release, Gregg showed Correctional Officer Dalton Dodge a "Urantia Book" that he had brought with him, stated it was his "Bible," and said he wanted to bring it into his dorm with

him so he could practice his religion on his own. According to Gregg, CO Dodge told him to check with Sergeant Brittany Edge about the book. However, Gregg represents that when he did so, Edge told him to ask "administration," which Gregg thought meant Edge was fine with the book so long as CO Dodge approved it.

Dodge later issued Gregg a conduct report for lying about the book and violating the Huber program, for which he was confined to his dorm for five days. In response, Gregg submitted a grievance about the book and conduct report as well, stating that he was attempting to practice his religion because he had been provided no other alternatives. Jail staff responded that because the book was not from the jail library, it had to follow a process and be reviewed by administration before it could be brought into the jail. While Gregg appealed, he was released from the jail on September 18, 2023, before that appeal was resolved.

## OPINION

Summary judgment will be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That standard does not change when determining cross-motions for summary judgment. *Calumet River Fleeting, Inc. v. International Union of Operating Engineers, Local 150, AFL-CIO*, 824 F.3d 645, 647–48 (7th Cir. 2017). The court "construe[s] all facts and inferences" in favor of each non-moving party in turn. *Id*.

### I. First Amendment Free Exercise

To prevail on a First Amendment free exercise claim, a prisoner must show that (1) the defendants imposed a "substantial burden" on his religious exercise; and (2) the burden was

not reasonably related to a legitimate penological interest. *Neely-Bey Tarik-El v. Conley*, 912 F.3d 989, 1003 (7th Cir. 2019); *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). A substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Childs v. Webster*, 168 F.4th 1020, 1032 (7th Cir. 2026) (citation omitted). Here, plaintiff represents that "access to religious texts and the opportunity to attend worship services are central components of plaintiff's religious practices." (Dkt. #23, at 4.) In some circumstances, denial of religious services for a limited period of time *could* create a substantial burden on an inmate's religious beliefs. *See, e.g.*, *Williams v. Hansen*, 5 F.4th 1129, 1136 (10th Cir. 2021) (denying "religious services for a month would also create a substantial burden"); *Makin v. Colorado Department of Corrections*, 183 F.3d 1205, 1215 (10th Cir. 1999) (failing to provide meals to an inmate at appropriate times throughout the month of Ramadan substantially burden inmate's religious exercise). However, plaintiff develops no argument about whether inability to attend worship services or access religious texts substantially burdened *his* religious practice by putting "substantial pressure" on him to "modify his behavior and to violate his beliefs." *Childs*, 168 F.4th at 1032 (plaintiff bears initial burden of proving implication of religious exercise for free-exercise claims). Thus, plaintiff fails to make a *prima facie* free exercise claim and his motion for summary judgment must be denied. With respect to defendants' motion, however, defendants do not dispute for purposes of summary judgment that they imposed a substantial burden on plaintiff's religious exercise.

Regardless, defendants argue that the restrictions on plaintiff's religious exercise were justified by legitimate penological interests. In determining whether restrictions on a prisoner's religious exercise are reasonably related to a legitimate penological interest, the court considers four factors: (1) whether there is a "valid, rational connection" between the restriction and a

legitimate governmental interest; (2) whether the prisoner retains alternatives for exercising the right; (3) the impact that accommodation of the right will have on prison administration; and (4) whether there are other ways that prison officials can achieve the same goals without encroaching on the right. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350–52 (1987) (citing factors articulated in *Turner v. Safley*, 482 U.S. 78, 89–91 (1987)).

The first Turner factor—whether there is a "valid, rational connection" between the restriction and a legitimate governmental interest—"imposes a threshold factor that every regulation must meet." *Decker v. Sireveld*, 109 F.4th 975, 979 (7th Cir. 2024) (citing *Turner*, 428 U.S. at 89–90). Defendants cite "institutional security" as the reason for the restriction, which is certainly a legitimate governmental interest. *Cutter v. Wilkinson*, 544 U.S. 709, 712, 725, n.1. (2005). But it is not enough to invoke security in general terms; defendants have the burden of providing a "plausible explanation" of how that interest is served by restricting plaintiff from attending religious services. *Beckman v. Reagle*, No. 23-2962, 2024 WL 3983325, at *2 (7th Cir. Aug. 29, 2024); *Blake v. West*, No. 21-CV-493-JDP, 2025 WL 915791, at *9 (W.D. Wis. Mar. 26, 2025); *see also Conyers v. Abitz*, 416 F.3d 580, 585 (7th Cir. 2005) (state's "general explanation" that a restriction on Ramadan participation was justified by notice and administrative needs insufficient to defeat summary judgment). If defendants provide a plausible explanation for the restriction, the burden shifts to plaintiff to present evidence calling that explanation into question. *Singer v. Raemisch*, 593 F.3d 529, 537 (7th Cir. 2010).

Here, defendants' sole argument is that jail policy keeps Huber inmates separate from other minimum and medium security inmates to reduce opportunities for contraband to be introduced into the jail. "Preventing contraband from entering a prison is a legitimate penological interest that justifies some intrusions on an inmate's First Amendment rights."

*Williams v. Wade*, 354 F. Supp. 2d 894, 897 (W.D. Wis. 2005); *see also Birkley v. Ball*, No. 25-2729, 2026 WL 2597921, at *2 (7th Cir. Sept. 2, 2026) (inspection of incoming mail for contraband valid restriction on inmate's First Amendment rights). However, defendants fail to develop this argument in light of the facts and circumstances in this case. Specifically, defendants' only support for this argument is Sergeant Westphal's response to a grievance filed by plaintiff requesting access to church services, in which Westphal represented what "the St. Croix County Jails Policy" stated as quoted above. (Dkt. #23, at 2.) Defendants did not provide a copy of that policy, so Westphal's written reference to it amounts to hearsay. Nor did defendants provide any explanation from anyone about the policy itself or how the policy is relevant to church services in particular. By way of example only, defendants have provided no evidence about: the format of church services; how many inmates generally attend; what security is present; whether the Huber inmates could be segregated or would be required to interact with other inmates; or the likelihood contraband could be introduced during such services, especially given other evidence in the record that Huber inmates are strip searched each time they return to the jail. (Dkt. #32-2.) Without such evidence, the court cannot conclude that defendants reasonably applied to policy to restrict plaintiffs' access to church services.

More significantly, even if the court concluded that plaintiff's exclusion from the services with minimum and medium security inmates was justified by concern over an exchange of contraband, that security interest does not explain why plaintiff could not attend alternative religious services. To begin, the evidence in the record so far establishes without explanation that Huber inmates are permitted to attend church services only every other week, as opposed to every week like other inmates. Moreover, if the every-other-week group is full, there are

apparently no other options available for someone in plaintiff's circumstances. These restrictions *may* be justified by security or administrative concerns, limited availability of jail space or volunteers to lead services, or other penological interests. Once again, however, defendants offer *no* explanation for the limited access to religious services for Huber inmates. In particular, defendants provide no evidence about how many Huber inmates were in the current "Overcomers in Christ Group"; why that group could not accommodate one more person; or why they were unable to run a larger or more frequent Christian services for Huber inmates. Given defendants' failure to provide *any* explanation for these limitations, they have not met their initial burden to show that the restrictions on plaintiff's access to religious services were rationally connected to a legitimate penological interest.

As for the second *Turner* factor, neither plaintiff nor defendants provide evidence about whether plaintiff was provided adequate alternatives to exercise his religious beliefs in the absence of weekly, in-person services. Rather, after plaintiff was told that the Overcomers in Christ group was full, he was apparently given no alternative suggestions or opportunities for religious services. When plaintiff attempted to study on his own, his religious book was apparently confiscated. Even after plaintiff explained that he was attempting to practice his religion because he'd been offered no other options, defendants do not dispute that they failed to offer any alternative means for him to obtain his religious text or attend services. [2] As the

[2] As discussed above, preventing contraband from entering the prison is a legitimate penological interest. Thus, the jail's policy requiring that books -- including religious texts -- be screened before being brought into the jail is connected to a legitimate penological interest in keeping contraband out of the institution. *See Le Bourgeois v. Wolf*, No. 17-C-1375, 2020 WL 1158553, at *6 (E.D. Wis. Mar. 10, 2020) (prison rules involving property and contraband that resulted in religious text being destroyed were justified by legitimate penological interest). For this reason, plaintiff does not have a valid, stand-alone First Amendment claim regarding defendants' prohibiting his bringing a religious text into his dorm without following jail rules

Supreme Court has explained, the absence of any alternatives "is not conclusive of the reasonableness of the Policy," but it does provide "some evidence that the regulations are unreasonable." *Beard v. Banks*, 548 U.S. 521, 532 (2006) (internal quotations and brackets omitted). Without more information, the court cannot determine whether the policy was unreasonable or how this *Turner* factor should be resolved.

Similarly, with respect to the third and fourth *Turner* factors -- the impact that accommodation of the right will have on jail administration and whether there are other ways that jail officials can achieve the same goals without encroaching on the right -- neither plaintiff nor defendants provided evidence about whether permitting plaintiff to attend church services with either the minimum and medium security inmates or the Huber Overcomers in Christ group would have a significant impact on jail administration. Given this lack of record evidence, the court cannot conclude as a matter of law whether the jail's restrictions were reasonably related to legitimate penological interests.

## II. Qualified Immunity

Defendants argue in the alternative that they are entitled to qualified immunity. Under this doctrine, a plaintiff may not obtain damages for a constitutional violation against a public official unless the plaintiff shows that the official violated clearly established law. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 725 (7th Cir. 2013). "To be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every

---

requiring permission for obtaining books. However, it is not clear from the record whether plaintiff attempted to later bring his religious text into the jail following proper procedures, or whether he was able to practice his religious in other ways.

reasonable official would have understood that what he is doing violates that right." *Doe v. Gray*, 75 F.4th 710, 716-717 (7th Cir. 2023) (citations omitted). Moreover, the right must be "beyond debate" and defined with specificity. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citations omitted). Thus, to show the existence of a clearly established right, a plaintiff must "identify a reasonably analogous case that articulated the constitutional right at issue and applied it to a similar factual circumstance, or [ ] show that the violation was so obvious that a reasonable official in the defendants' positions necessarily would have recognized that their actions violated the Constitution." *Garcia v. Posewitz*, 79 F.4th 874, 880 (7th Cir. 2023) *(citing Cibulka v. City of Madison*, 992 F.3d 633, 640 (7th Cir. 2021)). Finally, plaintiff bears the burden of demonstrating that his rights were clearly established to overcome qualified immunity. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011).

In defendants' view, it was not clearly established that jail administration violates the First Amendment by "prevent[ing] the intermingling of inmates with different security classifications, and disciplin[ing] inmates when they lied and attempted to bring contraband into the Jail." (Dfts.' Br. (dkt. #31) at 10.) However, this formulation of the relevant right is too broad. The relevant inquiry is whether an inmate has the right to access religious services -- assuming the inmate has shown that denial would substantially burden his religious beliefs -- unless the jail's restriction is based on a legitimate security concern. *See Conyers,* 416 F.3d at 586 (framing question as to whether it was "clearly established that prison officials must have a legitimate penological interest before imposing a substantial burden on the free exercise of an inmate's religion"); *Baltas v. Chapdelaine*, 153 F.4th 328, 340 (2d Cir. 2025) (framing question as whether, "absent a legitimate penological purpose . . .prisoners have a constitutional right to participate in congregate religious services"); *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d

Cir. 1993) (same). The answer to that question is clearly established: "Prisons must permit inmates the reasonable opportunity to exercise religious freedom," although "prison restrictions that infringe on an inmate's exercise of his religion are permissible if they are reasonably related to a legitimate penological objective, such as security and economic concerns." *Maddox v. Love*, 655 F.3d 709, 719 (7th Cir. 2011) (quoting *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972) (per curiam)); *see also Kemp v. Liebel*, 877 F.3d 346, 354 (7th Cir. 2017) (Prisons may not "place arbitrary obstacles in the way of inmates seeking to participate in the sect's mode of observance."); *Young v. Ericksen*, 758 F. Supp. 2d 777, 786 (E.D. Wis. 2010) (denying qualified immunity where plaintiff's "right to exercise his religion [absent legitimate penological concerns] was sufficiently clear in light of prior precedent"); *Gill v. Hoadley*, 261 F.Supp.2d 113, 126 (N.D.N.Y. 2003) ("it is unquestioned that the right of an inmate to freely exercise his or her religion by attending congregate religious services, absent legitimate penological concerns mitigating to the contrary, was and has been clearly established").

In sum, at the time of defendants' challenged conduct, the law was clearly established that defendants could not deny all of plaintiff's requests to participate in religious services or study his religious text without a legitimate penological justification. Because defendants provided insubstantial evidence to support their asserted interest, they are not entitled to qualified immunity.[3]

---

[3] In fairness, line officers like Sergeant Westphal and Office Dodge may not have been aware that "staff administration" and jail policy would fail to accommodate reasonable grievances by plaintiff for congregate services, but since we only have plaintiff's version of his conversations with these defendants, and no explanation as to what their expectations were for review of plaintiff's requests, the current record prevents a ruling as to possible qualified immunity.

## III. Personal Involvement

Finally, defendants argue that all defendants except defendant Officer Dodge should be dismissed for lack of personal involvement. (Dkt. #31, at 3.) *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (liability for claims brought under 42 U.S.C. § 1983 are generally limited to defendants with personal involvement in the alleged constitutional violation). However, the record is unclear as to which defendants were responsible for creating or implementing the jail policies and Huber restrictions that prevented plaintiff from regularly attending congregate services or offering an acceptable alternative. Plaintiff asserts, without detail, that he asked all the defendants for assistance in attending services and obtaining his religious texts, while defendants assert that the only defendant involved was Dodge. As discussed below, the parties should address in their supplemental summary judgment materials which defendants were actually involved in either creating or enforcing the policies at issue, which defendants were aware of plaintiff's complaints about lack of church services, and which defendants had authority to address plaintiff's concerns.

## IV. Supplemental Proposed Findings of Fact and Argument

For all of the reasons discussed above, neither party has shown that they are entitled to summary judgment on plaintiff's First Amendment claim. Normally, disputed facts about the jail's justification for policies and restrictions would need to be resolved by a jury; on the current record, however, the court cannot determine whether there are any disputed issues of fact. Moreover, the ultimate questions regarding the reasonableness of defendants' restrictions on plaintiff's free exercise of his religion and qualified immunity are for the court to resolve as a matter of law. *Watkins v. Kasper*, 599 F.3d 791, 796–97 (7th Cir. 2010). Thus, before

preparing this case for a jury trial, the court will require the parties to submit supplemental summary judgment filings that address the court's numerous, remaining factual questions set forth above. Specifically, the parties should address: (1) whether plaintiff's religious exercise was substantially burdened by defendants' restrictions and whether he was offered other, alternative means to practice his religion; (2) how religious services operated at the St. Croix County Jail, including the different services for Huber and other inmates; (3) how many inmates generally attend Huber services and who supervises those services; (4) what specific security concerns exist relating to religious services and how the jail's restrictions address those concerns; (5) what impact accommodating plaintiff would have imposed on jail security or effective administration; (6) which defendants specifically were involved in creating the policies at issue and responding to plaintiff's grievances, including the accommodation of reasonable alternatives; and (7) any other information the parties' feel is necessary for the court to resolve the parties' cross motions for summary judgment. Given their respective burdens, defendants will be asked to file their supplement first, after which plaintiff may respond.

If necessary, the court will then hold an oral argument on the parties' cross-motions for summary judgment on December 16, 2026. In the meantime, all deadlines relating to trial are stayed.

## ORDER

IT IS ORDERED that:

1) Defendants' supplemental summary judgment materials are due November 20, 2026.
2) Plaintiff LeAnder Gregg's response to defendants' supplemental summary judgment materials is due December 4, 2026.

3) The court will hold an oral argument, if necessary, on December 16, 2026, at 11:00 a.m.

4) All remaining deadlines are STAYED.

Entered this 6th day of November, 2026.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge